IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

KENT WILLIAM SPROUSE,           §
           *Petitioner,*        §
                                §
V.                              §
                                §       No. 3:10-CV-00317-P
RICK THALER, Director,          §
Texas Department of Criminal    §       (death-penalty case)
Justice, Correctional           §
Institutions Division,          §
           *Respondent.*        §

**MEMORANDUM OPINION AND ORDER**
**GRANTING MOTION FOR SUMMARY JUDGMENT**
**AND DENYING APPLICATION FOR WRIT OF HABEAS CORPUS**

Petitioner Kent William Sprouse was convicted of capital murder and sentenced to death in

Ellis County, Texas. *State v. Sprouse*, No. 26,824 (40th Jud. Dist. Ct., Feb. 26, 2004). The

conviction and sentence were affirmed on appeal. *Sprouse v. State*, No. AP-74,933, 2007 WL

283152 (Tex. Crim. App. Jan. 31, 2007). Sprouse then filed an application for writ of habeas corpus

in state court which, after being twice remanded for factual development, was denied. *Ex parte*

*Sprouse*, No. WR-66950-01, 2010 WL 374959 (Tex. Crim. App. Feb. 3, 2010) (denying relief) (per

curiam); *Ex parte Sprouse*, No. WR-66950-01, 2009 WL 335449 (Tex. Crim. App. Feb. 11,

2009)(second remand order); *Ex parte Sprouse*, No. WR-66950-01, 2007 WL 1839481 (Tex. Crim.

App. June 27, 2007) (first remand order).

Pursuant to 28 U.S.C. § 2254, Sprouse has filed a petition for writ of habeas corpus (doc. 16)

and supporting memorandum (doc. 17) ("petition") alleging the following grounds for relief:

1.      Trial counsel provided ineffective assistance at the guilt phase of trial by:

    a.      failing to retain and present testimony of an addiction expert,
    b.      failing to retain and present testimony of a neuropsychologist and
            conduct a brain scan, and
    c.      failing to investigate and present testimony regarding
            Sprouse's birth parents and childhood acquaintances.

2.      Trial counsel provided ineffective assistance at the guilt phase of trial by failing to
        request an instruction on insanity caused by long-term drug use.

3.      Trial counsel provided ineffective assistance at the sentencing phase of trial by:

    a.      lodging a "knee-jerk" objection to the prosecution's videotape
            recording of Sprouse's psychological interview,
    b.      failing to investigate and present testimony regarding
            Sprouse's birth parents and childhood acquaintances,
    c.      failing to retain and present testimony of a neuropsychologist
            and conduct a brain scan, and
    d.      failing to retain and present testimony of an addiction expert.

4.      The evidence is legally insufficient to establish future dangerousness.

5.      Trial counsel provided ineffective assistance by failing to object when the compe-
        tency jury was informed of the facts of the offense.

6.      The jury instruction on intoxication during the punishment phase violated the Eighth
        Amendment, and counsel's failure to object or preserve it constituted ineffective
        assistance of trial counsel and/or appellate counsel.

7.      Trial counsel provided ineffective assistance by failing to challenge the constitu-
        tionality of the Texas death penalty statute on the ground that it does not provide for
        meaningful appellate review.

8.      Trial counsel provided ineffective assistance by failing to challenge the statutory
        definition of "mitigating evidence" as unconstitutionally narrow.

9.      Trial counsel provided ineffective assistance by failing to challenge the Texas death
        penalty statute on the grounds that the aggravating factors are vague and do not
        properly channel the jury's discretion.

2

10.    Trial counsel provided ineffective assistance by failing to challenge the Texas death penalty statute on the ground that it prohibits informing the jury of the consequences of a "hold out" juror.

11.    Trial counsel provided ineffective assistance by failing to challenge the Texas death penalty statute on the ground that it does not allocate to the State the burden of proving a lack of mitigating evidence.

Respondent Rick Thaler filed an answer and motion for summary judgment (doc. 45), and Sprouse filed a reply (doc. 51). The Court grants the motion for summary judgment, denies habeas relief, and grants a certificate of appealability as to Issue 6.

## I. BACKGROUND FACTS

The Texas Court of Criminal Appeals ("CCA") summarized the facts of this offense as follows:

On October 6, 2002, [Sprouse] stopped at a gas station and food mart in Ferris, Texas. When he entered the store to make his purchases he had a shotgun hanging from his shoulder. A short time after returning to his vehicle, [Sprouse] fired his weapon in the direction of two men at a pay telephone on the premises. Startled by the shot, another customer, Brad Carroll, asked [Sprouse] if he was "okay." [Sprouse] responded that the gun was not real and asked Carroll if he would help him get his car started. Carroll agreed and pulled his truck in front of [Sprouse]'s car to use booster cables. While [Sprouse] was working on his car, Carroll noticed several boxes of buckshot in [Sprouse]'s vehicle, determined that the gun was real, and decided to leave. As Carroll drove away, he heard another gun shot. When he turned to look, he saw a bleeding man lying on the ground, and [Sprouse] was pointing his shotgun in the man's direction. Just after he left the property, Carroll saw a police officer's car pull into the station. He then heard two more shotgun blasts and pistol fire.

While waiting to get diesel gasoline, Brandon O'Neill saw [Sprouse] working on his vehicle and Pedro Moreno filling his truck with gas. O'Neill noticed that [Sprouse] appeared to speak to Moreno, but Moreno did not respond. [Sprouse] then reached into his vehicle, pulled out a gun, and shot Moreno.

In response to a 911 call, Officer Harry Marvin Steinfeldt, III, dressed in a police uniform and driving a police vehicle, responded to the shooting at the gas station. When he arrived at the station, Steinfeldt first noticed Moreno on the ground

3

and then turned toward [Sprouse]'s car, at which time [Sprouse] shot Steinfeldt twice.  Steinfeldt returned fire after he hit the ground.  After Steinfeldt collapsed, [Sprouse] walked to the side of the food mart.  As [Sprouse] was walking, a second officer, Brad Lindsey, arrived on the scene and managed to take him into custody without further incident.

Moreno and Steinfeldt both died from their injuries. Several witnesses stated that [Sprouse] showed no emotion and was rather nonchalant throughout the incident. In the ambulance on the way to the hospital to receive treatment for the wounds he suffered in the exchange of gunfire, [Sprouse] gave his name and address to the officer accompanying him.  [Sprouse] then stated several times without prompting that he had killed an undercover officer at the gas pumps and had shot a second officer in uniform.

The doctor who treated [Sprouse] thought that he was under the influence of drugs when he was admitted, and subsequent testing revealed that [Sprouse] had ingested methamphetamines within the forty-eight hours preceding his arrival at the hospital.  A trauma nurse who attended to [Sprouse] at the hospital stated that [Sprouse] was belligerent, swearing, and uncooperative regarding the medical care he was receiving.  She also stated that [Sprouse] repeated that "two cops got whacked."

In response to the State's case on guilt, [Sprouse] called several witnesses who testified to his non-violent nature, but who also opined that [Sprouse] was mentally ill.  One witness, who claimed to know [Sprouse] "pretty well," testified that he never acted in a violent manner.  However, some things that [Sprouse] had told her made her suspect that he was mentally ill long before the instant offense occurred.  She stated that [Sprouse] had been hospitalized at one point and had told her that he saw dead people.  She also often saw [Sprouse] talking to himself. Another witness, who had known [Sprouse]'s family for forty years and had spent a couple of weeks with them every year around Easter, stated that [Sprouse] behaved very differently from normal during Easter 2002--he had bursts of anger, saw things that did not exist, heard voices giving him commands, and said that everyone was out to get him.

[Sprouse]'s mother testified that [Sprouse]'s behavior began to change around Christmas 2001.  She  stated that he was frightened and upset, thought that people were talking to him through the television, and thought that the CIA and FBI wanted to kill him.  [Sprouse]'s mother was so concerned that, around April or May 2002, she had [Sprouse] committed to a mental hospital when he refused to see a doctor on his own, but he was back out on the street after seventy-two hours.  She noted that [Sprouse]'s condition only worsened after that time.

Dr. Jaye Douglas Crowder, a psychiatrist appointed to examine [Sprouse], testified that he interviewed [Sprouse] several times, as well as [Sprouse]'s friends and family members. Crowder testified that [Sprouse] was psychotic each time he was interviewed. He also stated that [Sprouse] had an extensive history of psychotic behavior and delusional thinking. Crowder opined that, on the day of the offense, [Sprouse] was psychotic, paranoid, believed people were persecuting him, and did not understand the wrongfulness of his conduct.

The State called several witnesses to rebut [Sprouse]'s case. Dr. Chris Bell, a surgery resident who treated [Sprouse] at the hospital on October 6, 2002, testified that [Sprouse] admitted using cocaine and amphetamines, and subsequent testing confirmed that amphetamines, methamphetamines, and cannabis were in [Sprouse]'s system. Bell also testified that, while he felt [Sprouse] was under the influence of drugs when he was admitted to the hospital, he did not have the same impression when he talked to [Sprouse] later that week.

Dr. Lisa Clayton, a psychiatrist, testified that she interviewed [Sprouse] and that he exhibited no signs of psychotic behavior during the interview. In fact, [Sprouse] told her that he was not really paranoid. She ultimately concluded that [Sprouse] was not insane at the time of the murders. Clayton did not talk with [Sprouse]'s friends or family members.

Two detention officers at Ellis County Jail testified that they had regular contact with [Sprouse] during his incarceration, and they never saw him agitated, pacing, or talking to himself. The nurse at the jail testified that [Sprouse] received antibiotics and pain medication, and just prior to trial, he received an antidepressant and sleep aid. She also testified that there was a period of time during which [Sprouse] was prescribed a drug that she thought was an anti-psychotic medication; however, she never saw [Sprouse] agitated, pacing, or muttering to himself.

Finally, Dr. Richard Rogers, a forensic psychologist who had written a book about conducting insanity evaluations, testified that he spent approximately eleven hours with [Sprouse] while evaluating him. Rogers testified that the most likely diagnosis for [Sprouse] at the time of the murders was a substance-induced psychotic disorder with paranoid delusions, and he opined that [Sprouse] understood the wrongfulness of his acts on October 6, 2002. Rogers admitted that he had not talked to [Sprouse]'s friends or family members and admitted that he was not aware that [Sprouse] behaved strangely in the days before the murders. Nonetheless, he opined that, despite [Sprouse]'s mental illness, his psychosis did not manifest itself on the day of the murders and, therefore, did not prevent [Sprouse] from understanding that his conduct was wrong.

5

At punishment, the State called former Ellis County Deputy Sheriff Adam Irwinsky who testified that he and his trainee were called out to [Sprouse]'s home on July 22, 2002, with regard to a "disturbance with possibly a gun involved." When Irwinsky asked [Sprouse] to step outside, [Sprouse] responded that he would not come out because they would jump on him. Irwinsky assured [Sprouse] that they would not jump on him, and [Sprouse] laid down a .357 magnum handgun he was holding and came out. [Sprouse] told the officers that he and his parents were having an argument that day. No arrests were made, no guns were seized, and [Sprouse] did leave the premises with a friend.

*Sprouse*, 2007 WL 283152 at *1-3.

Sprouse, who is adopted, raises claims related to his mental condition at the time of the offense and whether it was caused by a primary mental illness (schizophrenia) or was the result of brain damage due to his long-term drug abuse. Since trial, six experts have contributed their opinions to this matter.[1]

Dr. Kelly Goodness was the consulting psychologist and mitigation expert for the defense. She believed that Sprouse's history warranted a diagnosis of schizophrenia and amphetamine dependence in institutional remission. (2 SHR 292, 304, 309).[2] She also reported that it was impossible to ferret out how much, if any, of Sprouse's psychosis was the result of meth-amphetamine abuse and that this determination would require presumptions of fact that are best left to the triers of fact. (2 SHR 298). Dr. Crowder, the court-appointed psychiatrist who testified in support of Sprouse's insanity defense, stated that Sprouse has a long-standing psychotic disorder due to schizophrenia. (9 RR 10; 26 RR 147, 137). Dr. Crowder readily agreed, however, that Sprouse's

---

[1] A seventh expert, psychiatrist Daryl Matthews, testified for the State at Sprouse's competency trial only, which was held about five months before the capital murder trial. (9 RR 54). Dr. Matthews made a provisional diagnosis that included schizophrenia. (9 RR 89-90).

[2] "RR refers to the trial court reporter's record, preceded by volume number and followed by page number. Likewise, "CR" refers to the trial court clerk's record. "SHR" refers to the state habeas record, which consists of volumes 1-3 and supplemental volumes 1, 2, 3, 4, 5, 6A, 6B, and 7.

6

psychosis could have been caused by–and was "certainly worsened" by–Sprouse's methamphetamine abuse during the preceding decade.  (26 RR 137-40, 147, 158).

Dr. Clayton, a psychiatrist who testified for the State at trial that she observed no psychosis when she evaluated Sprouse, believed Sprouse was intoxicated on methamphetamine at the time of the offense.  (27 RR 29, 33, 36, 71).  The prosecution's second expert, psychologist Dr. Rogers, believed the most likely diagnosis at the time of the homicide was substance-induced psychotic disorder with paranoid delusions, that is, psychosis brought on by brain damage due to Sprouse's chronic methamphetamine abuse, not schizophrenia.  (9 RR 119; 27 RR 132, 146).  Dr. Rogers did not believe Sprouse was experiencing delusions at the time of the offense; he believed Sprouse was simply "high on drugs."  (27 RR 132-36).  This testimony is significant to Sprouse's issues before the Court because voluntary intoxication, even if it causes temporary insanity, is not a defense to the commission of a crime.  *See* Tex. Penal Code Ann. § 8.04 (West 2012) (effective Sept. 1, 1994).

As Sprouse aptly noted in his original state writ application, "[N]one of the experts at trial was able to state unequivocally that Mr. Sprouse's problems were *not* solely due to his drug use." (1 SHR 72) (emphasis added).  Consequently, state habeas counsel sought and received funding to hire an addiction specialist, Terry Rustin, to mitigate the evidence of Sprouse's drug addiction.  (3 SHR 357-61; Supp. 6A SHR 30).  Dr. Rustin agreed with the prosecution's second expert (Dr. Rogers), that Sprouse has substance (amphetamine)-induced psychotic disorder with delusions. *Attachment D* at 10.  State habeas counsel also sought and received funds to hire a mitigation specialist, Toni Knox, to investigate the medical and psychological history of Sprouse's birth parents and to conduct a general mitigation investigation.  (3 SHR 372-80; Supp. 6A SHR 30).  Knox

learned that Sprouse's birth mother had a cousin with bipolar disorder and a drug problem.  (Supp. 6B SHR 123).

In this proceeding, Sprouse received funding to continue the investigation of his birth parents, which he concedes has not produced favorable results.  *Reply* at 2 n.1.  Sprouse also received funds to retain a neuropsychologist, Dr. Shawanda Anderson, whose report has been filed with the Court. *Exhibit B to Reply* (doc. 51-3).  As with Dr. Rogers and Dr. Rustin before her, Dr. Anderson concluded that Sprouse's mental problems are related to his chronic drug abuse.  *Ex. B* at 6.

## II. GENERAL STANDARDS OF REVIEW

### A.  AEDPA

Sprouse asserts that the standard of federal habeas review required by the Antiterrorism and Effective Death Penalty Act of 1996  ("AEDPA") interferes with the Court's duty to interpret the law and violates the separation of powers doctrine.  He asks the Court to conduct a *de novo* review for constitutional error in this case.  *Petition* at 20-27.  Sprouse acknowledges, however, that the Fifth Circuit has rejected this contention.  *Petition* at 20 n.3; *see Rivas v. Thaler*, 432 Fed. App'x 395, 407 (5th Cir.), *cert. denied*, 132 S. Ct. 850 (2011) (citing *Dufrene v. Brazoria Cnty. Dist. Attorney*, 146 F. App'x 715, 717 (5th Cir. 2005), *Hughes v. Johnson*, 191 F.3d 607, 612 (5th Cir. 1999), and *Corwin v. Johnson*, 150 F.3d 467, 472 (5th Cir. 1998)).  Accordingly, the heightened standards of review set out in the AEDPA govern this petition.  *See* 28 U.S.C. § 2254.

### B.  Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be rendered if the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  This rule applies with

equal force in the context of habeas corpus cases to the extent it is not inconsistent with any statutory provision or the Rules Governing Section 2254 Cases. *See* R. 12 of the Rules Governing § 2254 Cases in the United States District Court; *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000). In ordinary civil cases, a district court considering a motion for summary judgment must believe the nonmovant's evidence and draw all justifiable inferences in his favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). Where, however, a state prisoner's factual allegations have been resolved against him by express or implicit findings of the state courts, and the prisoner fails to demonstrate by clear and convincing evidence that the presumption of correctness established by 28 U.S.C. § 2254(e)(1) should not apply, it is inappropriate, if not unauthorized, for the facts of a case to be resolved in his favor. *See Emery v. Johnson*, 940 F. Supp. 1046, 1051 (S.D. Tex. 1996), *aff'd* 139 F.3d 191 (5th Cir. 1997) (applying former habeas statute and citing *Marshall v. Lonberger*, 459 U.S. 422, 432 (1983); *Sumner v. Mata*, 449 U.S. 539, 547 (1981)); *see also Jennings v. Thaler*, No. H-09-219, 2012 WL 1440387, *2 (S.D. Tex. April 23, 2012).

### III.   UNEXHAUSTED CLAIMS

The parties dispute whether Issue 2 and parts of Issues 1 and 3 are unexhausted and procedurally barred under *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991). *See Answer* at 17; *Reply* at 2 n.2, 8, 11 n.9.

### A.   Applicable Law

Under the exhaustion requirement, a federal court may not grant  habeas relief on any claim that the state prisoner has not first attempted to present in state court. *See* 28 U.S.C. §

9

2254(b)(1)(A); *Harrington v. Richter*, 131 S. Ct. 770, 787 (2011).[3]   A habeas petitioner has not exhausted the remedies available in state court if he has the right under the law of the state to raise, by any available procedure, the question presented.   *See* § 2254(c).   Unless a petitioner can demonstrate cause and prejudice, unexhausted claims are procedurally barred in federal court if the state court to which petitioner must return would likely dismiss the subsequent petition on state procedural grounds.   *See Coleman*, 501 U.S. at 735 n.1.   Thus, article 11.071, section 5(a)(1) of the Texas Code of Criminal Procedure bars federal habeas review where a subsequent state application raises a claim that was factually or legally available when the original application was filed.   *See* Tex. Code Crim. Proc. Ann. art. 11.071, § 5(a)(1) (West 2011); *Rocha v. Thaler*, 626 F.3d 815, 837 (5th Cir. 2010); *Balentine v. Thaler*, 626 F.3d 842, 856-57 (5th Cir.) (op. on reh'g), *cert. denied*, 131 S. Ct. 2992 (2010).

For potentially meritorious claims of ineffective assistance of trial counsel, the United States Supreme Court has held that the ineffective assistance of initial state habeas counsel may establish cause to excuse procedural default.   *See Martinez v. Ryan*, 132 S. Ct. 1309, 1320 (2012) (holding that "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.").   A petitioner seeking to rely on *Martinez* to excuse procedural default must show the underlying ineffective-assistance-of-trial-counsel claim to be substantial, "which is to say that the prisoner must

---

[3] A federal court may, however, deny relief on the merits notwithstanding any failure to exhaust. *See* 28 U.S.C. § 2254(b)(2); *Miller v. Dretke*, 431 F.3d 241, 245 (5th Cir. 2005).

demonstrate that the claim has some merit." *Id.* at 132 S. Ct. at 1318. Sprouse relies on *Martinez* and the alleged ineffective assistance of state habeas counsel to excuse the procedural default of his claims in Issues 1b, 2, and 3c. *Reply* at 2 n.2, 8, 11 n.9.

There has been further development of this issue in the time since Sprouse filed his Reply. The Fifth Circuit held that *Martinez* does not apply to Texas inmates because "Texas habeas procedures do not mandate that ineffectiveness claims be heard in the first instance in habeas proceedings." *See Ibarra v. Thaler*, 687 F.3d 222, 227 (5th Cir. 2012). And the Fifth Circuit's interpretation of *Martinez* has been challenged in *Trevino v. Thaler*, No. 11-1018, 133 S. Ct. 524 (2012), a federal habeas case currently pending in the Supreme Court. Because the Court concludes in the following discussion that Sprouse's unexhausted claims are procedurally defaulted and also lack merit, the Court need not predict the outcome in *Trevino* nor address whether *Martinez* excuses any procedural default in this case.

## B. Discussion

Issues 1b, 1c, and 2 are based on trial counsel's failure to investigate and present the defense of "settled insanity" at the guilt phase of trial. In Issue 1b, Sprouse specifically contends counsel should have retained a neuropsychologist, who would have been able to demonstrate that Sprouse suffered from settled insanity caused by the "long-continued use of [ ] intoxicants." *Petition* at 33. In Issue 1c, Sprouse contends counsel should have investigated his birth parents and childhood acquaintances because it may have revealed a genetic predisposition to drug dependency or to mental illness. *Petition* at 34-36. In Issue 2, Sprouse contends counsel should have requested a settled-insanity instruction in the jury charge, as discussed in *Thomas v. State*, 177 S.W.2d 777, 778 (Tex. Crim. App. 1944). *Petition* at 36-38. Issue 3c challenges trial counsels' representation at

11

punishment, specifically, their strategy to present mitigation evidence through an insanity defense at guilt and then forego the presentation of evidence at sentencing in order to deprive the State of its rebuttal case. *Petition* at 39-40. Sprouse contends that trial counsel's failure to consult a neuro-psychologist undermined the reasonableness of this sentencing-phase strategy. *Petition* at 43; *Reply* at 10. All of the foregoing claims are unexhausted.

Ground 10 in Sprouse's state writ application and supplemental application focused on counsel's failure to develop mitigating evidence for sentencing and obtain an addiction expert, not a neuropsychologist. (1 SHR 70-73; Supp. 6A 45-72). The claims before this Court regarding counsel's failure to retain a neuropsychologist (Issue 1b and 3c) and the failure to request a settled-insanity instruction (Issue 2) were not presented to the state habeas court. A claim challenging counsel's investigation of Sprouse's birth family and childhood acquaintances was made with respect to the punishment phase of trial, but not the guilt phase. (Supp. 6A SHR 49). Therefore, counsel's alleged failure to conduct an adequate guilt-phase investigation into these matters (Issue 1c) is also unexhausted. *See Anderson v. Harless*, 459 U.S. 4, 6 (1982) (holding that it is not enough that the facts necessary to support the federal claim were before the state court or that a somewhat similar state-law claim was made); *Picard v. Connor*, 404 U.S. 270, 276 (1971) (holding that the exhaustion rule "would serve no purpose if it could be satisfied by raising one claim in state courts and another in the federal courts").

Given the legal and factual nature of these unexhausted claims, it appears they could have been raised in Sprouse's initial state application and that the CCA would now find them barred as an abuse of the writ. *See* art. 11.071, § 5(a). Therefore, the Court is procedurally barred from considering these claims unless an exception applies. *See Coleman*, 501 U.S. at 735 n.1. Sprouse

contends, pursuant to *Martinez*, that the ineffective representation by state habeas counsel excuses the procedural default. *Reply* at 2 n.2, 8, and 11 n.9. As noted above, to overcome procedural default based upon the deficient performance of state habeas counsel, Sprouse must demonstrate that the underlying ineffective-assistance-of-trial-counsel claims have "some merit." *Martinez*, 132 S. Ct. at 1318. The Court concludes that they do not.

### 1. The "Settled-Insanity Defense"

The Court assesses the merits of Sprouse's unexhausted ineffective-assistance claims under the well known *Strickland* standard. To prevail under this standard, a petitioner must demonstrate that (1) counsel's representation fell below an objective standard of reasonableness and (2) there is a reasonable probability that prejudice, sufficient to undermine confidence in the trial outcome, resulted from the deficiency. *See Bower v. Quarterman*, 497 F.3d 459, 466 (5th Cir. 2007) (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). The failure to show either deficient performance or actual prejudice defeats an ineffective-assistance claim. *Strickland*, 466 U.S. at 700; *e.g., Day v. Quarterman*, 566 F.3d 527, 536-39 (5th Cir. 2009).

The unexhausted claims in Issues 1b, 1c, and 2 flow from the allegation that trial counsel forfeited the opportunity to pursue the defense of "settled insanity." Relying on case law from 1944, Sprouse suggests the defense of settled insanity is available when a defendant, due to the long-continued use of drugs, does not have sufficient mental capacity to know (1) the nature and consequences of the very act he was committing, (2) that what he was doing was wrong, or (3) the difference between right and wrong as to the particular act charged against him in the case. *Petition* at 37; *Thomas*, 177 S.W.2d at 778. Sprouse alleges counsel were forced to rely on a theory of "insanity due to schizophrenia" because counsel erroneously believed that "drug use causing

permanent mental illness was not a defense under Texas law." *Petition* at 29-30; *Attachment A to Petition* (aff't of counsel); *Reply* at 6.  Respondent contends that settled insanity did not survive the enactment of the Texas Penal Code. *Answer* at 23.  The Court agrees with Respondent.

Texas law on this issue is straightforward. The CCA has unanimously held: "The only affirmative defense available under Texas law for those who commit crimes while suffering from an abnormal mental disease or defect is insanity under Section 8.01." *Mays v. State*, 318 S.W.3d 368, 385 (Tex. Crim. App. 2010), *cert. denied*, 131 S. Ct. 1606 (2011) (citing *Giesberg v. State*, 984 S.W.2d 245, 250 (Tex. Crim. App. 1998) (reaffirming that "only the Legislature can establish defenses and affirmative defenses to criminal offenses")).  Section 8.01 of the penal code defines insanity as follows:  "It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." Tex. Penal Code Ann. § 8.01(a) (West 2012) (effective September 1, 1994).  The insanity defense in section 8.01 is the only "diminished capacity" defense to criminal responsibility in Texas. *Ruffin v. Texas* 270 S.W.3d 586, 593 (Tex. Crim. App. 2008).  Texas does not recognize a lesser form of the insanity affirmative defense. *Jackson v. Texas*, 160 S.W.3d 568, 572 (Tex. Crim. App. 2005).

The trial court's charge applied this statutory definition of insanity.  Like the statute, the instruction did not require the jurors to identify the cause of Sprouse's mental deficits.  It required only that they believe "that at the time he committed said act, if he did, the defendant, as a result of severe mental disease or defect, did not know that his conduct was wrong." (CR 92).  Thus, if the jury believed Sprouse did not know his conduct was wrong, the charge permitted the jury to find him

14

insane, irrespective of whether his mental disease or defect was caused by primary mental illness or by brain damage from long-term drug abuse.[4]

To the extent the unexhausted guilt-phase claims in Issues 1b, 1c, and 2 rely on counsel having forfeited the opportunity to develop a "settled-insanity defense," they have no support in the law. Counsel is not ineffective for failing to raise a non-existent defense. *See Paredes v. Quarterman*, 574 F.3d 281, 291 n.12 & 13 (5th Cir. 2009) (recognizing that the failure to raise a meritless objection or argument is not ineffective assistance).

## 2. Failure to Hire a Neuropsychologist

Sprouse's neuropsychologist-related claims have no merit for the additional reason that counsel's investigation was professionally reasonable despite the fact that a neuropsychologist was not consulted, and there is no demonstrated prejudice. Relying on the report of Dr. Shawanda Anderson, Sprouse asserts in Issue 1b that a neuropsychologist would have confirmed that Sprouse suffered from "*demonstrable* physiological brain damage," which would have been vital to prove "settled insanity" and refute the prosecution's evidence of temporary intoxication at the guilt phase of trial. *Petition* at 33; *Reply* at 6. In Issue 3c, he posits that brain damage would have been powerful mitigation evidence at punishment too, regardless of whether it was related to drug use or not. *Petition* at 43; *Reply* at 10-11.

---

[4]Sprouse complains the prosecutor told the jury otherwise in her closing remarks by equating intoxication at the time of the offense to chronic mental disorder caused by fifteen years of methamphetamine abuse. *Petition* at 38. Assuming for the sake of argument that this unobjected-to remark during closing argument could form the basis of federal relief, Sprouse's interpretation of the record is debatable. The prosecutor's remarks could be interpreted to limit the jury's consideration of chronic mental illness, not insanity. (28 RR 34-35). In any event, the charge also instructed the jury to wholly disregard statements of law made by counsel "not in harmony with the law as stated to you by the Court in these instructions." (CR 94). The prosecutor's remarks are, therefore, harmless. *See Penry v. Johnson*, 532 U.S. 782, 799 (2001) (presuming generally that jurors follow their instructions).

15

"Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.  In this case, psychologist and mitigation expert, Kelly Goodness, prepared a notebook for trial counsel with information on schizophrenia, methamphetamine-induced psychosis, drug addiction, and the difficulties with a dual diagnosis of mental illness and drug addiction.  (2 SHR 176-204).  She conducted a current mental status exam, a competency evaluation, and an insanity evaluation on Sprouse.  (2 SHR 287, 301, 306).  She administered nine clinical instruments, including the Repeatable Battery for the Assessment of Neuropsychological Status.  (2 SHR 299, 303, 307).  She described Sprouse's immediate and delayed memory as "relatively satisfactory," his attention and concentration abilities as "adequate," and his remote memory as "intact."  (2 SHR 308-09).  Although she diagnosed Sprouse with schizophrenia and amphetamine dependence in institutional remission, she posed the question of whether Sprouse's psychosis was the result of methamphetamine abuse and stated that this determination would require presumptions of fact that are best left to the triers of fact.  (2 SHR 298, 309).  She noted that "[c]hronic methamphetamine use is not simply an intoxicated state, it is a brain damaged state in that chronic use permanently alters and damages the brain."  (2 SHR 298).

In the course of her mitigation investigation, Dr. Goodness obtained sixteen statements from witnesses who knew Sprouse well.  (2 SHR 235-86).  She reviewed law enforcement reports, hospital records, academic records, jail medical and disciplinary records, the competency trial record, and letters written by Sprouse.  (2 SHR 313-26).  She viewed the recording of the five-hour evaluation conducted by the prosecution's competency expert, Dr. Daryl Matthews, in which Sprouse states he received injuries, including head injuries, in three alcohol-related car wrecks but states that he has never been treated for a head injury.  (2 SHR 318-19); doc. 53 (disc 1).  Dr.

Goodness mentions these car wrecks in her report, (2 SHR 318), and she obtained details about them, as well as a motorcycle crash, from Sprouse's close friend. (2 SHR 248).

In addition to Dr. Goodness, psychiatrist Dr. Crowder evaluated Sprouse on five separate occasions. (26 RR 129-30). He consulted hospital records, law enforcement reports, and the report prepared by Dr. Goodness. (26 RR 130). He testified that Sprouse had either schizophrenia or substance-induced psychosis, depending on whether his symptoms were caused by primary mental illness or by substance abuse. (26 RR 137-38). He believed that drug use "certainly worsened" Sprouse's mental status. (26 RR 138). When asked how Sprouse could have psychotic symptoms after being incarcerated with no access to drugs, Dr. Crowder explained:

> Well, the reason is either he has the schizophrenia like I was talking about or it's the brain damage that we're seeing. Chronic abuse of methamphetamines destroys dopaminergic and scrotonergic nerve terminals. . . . It destroys the endings of the nerves in your brain so that the person ends up looking kind of schizophrenic. So it's one of those two things. Either the disease impaired the central nervous system or his chronic use of the substance had caused some very long lasting or perhaps permanent damage to the central nervous system.

(26 RR 139-40).

This record demonstrates that trial counsel's investigation was reasonable. Counsel knew the likelihood that Sprouse's mental condition was caused or exacerbated by brain damage due to long-term substance abuse but chose not to emphasize it. Given the options, counsel could have reasonably chosen to focus on the schizophrenia diagnosis to downplay Sprouse's responsibility for his own brain damage through extensive drug abuse. The extent of counsel's investigation into Sprouse's mental state, which included the assistance of these two experts as well as information gained from the prosecution in the competency trial, demonstrates reasonable professional judgment. *See Martinez v. Dretke*, 404 F.3d 878, 885-86 (5th Cir. 2005) (holding that counsel's reliance on

information gained during first trial, plus additional investigatory efforts into defendant's mental health records, family members, and expert psychiatric assistance was a reasonable mental health investigation).  Any disagreement with counsel's decision to focus on schizophrenia is not a basis for finding counsel ineffective.  *See Pape v. Thaler*, 645 F.3d 281, 291 (5th Cir. 2011), *cert. denied*, 132 S. Ct. 1100 (2012) (concluding court may not, in hindsight, second-guess counsel's strategy merely because an alternative course of action existed during trial);  *Wesbrook v. Thaler*, 585 F.3d 245, 251 (5th Cir. 2009), *cert denied*, 130 S. Ct. 1889 (2010) (holding that court may not find ineffective assistance merely because it disagrees with counsel's trial strategy).

Even if counsel's investigation had been deficient, Sprouse cannot show prejudice.  In addressing this issue, the Court is mindful of the different standards for demonstrating prejudice at each phase of trial.  *See Livingston v. Johnson*, 107 F.3d 297, 308 (5th Cir. 1997) (holding that the proper standard of review as to prejudice is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt or, with respect to the sentencing phase, would have concluded that the balance of aggravating and mitigating circumstances did not warrant death); *Strickland*, 466 U.S. at 694 (stating that a "reasonable probability" is a probability sufficient to undermine confidence in the outcome of trial).

Viewed in the light most favorable to Sprouse, Dr. Anderson's report contributes no new helpful information on the issues of brain damage and intoxication.[5]  She interviewed Sprouse on March 5, 2012 and administered seven tests of assessment.  *Ex. B* at 1.  She rendered no opinion as

---

[5]Even though further development of the record is prohibited by 28 U.S.C. § 2254(e)(2),  Dr. Anderson's affidavit is considered under the Court's power to review the merits of an unexhausted claim under § 2254(b)(2) and under the Supreme Court's directive that procedurally defaulted claims may be excused under *Martinez* only if they have "some merit."

18

to whether Sprouse was insane or intoxicated at the time of the offense, although she stated that he had ingested Valium and Xanax on that day. *Ex. B* at 3. She found minimal deficits in only two areas of functioning. *Ex. B* at 5, 6. She confirmed Sprouse's extensive drug abuse to the point of psychosis and delusions. *Ex. B* at 3. Like the experts before her, she did not have sufficient information to say whether Sprouse, who is adopted, was genetically predisposed to a psychotic disorder or to substance addiction. She opined that he had a "compromised brain" due to motor vehicle accidents and chronic substance abuse, and that the "residual effects are very likely permanent." *Ex. B* at 6. Dr. Anderson concluded that it was "not possible to use illicit substances for more than a decade and not have cognitive deficits and some residual effects." *Ex. B* at 6.

This is not new information. Dr. Anderson's report aligns closely with the information in trial counsel's possession. Moreover, it supports the prosecution theory at trial that Sprouse was under the influence of drugs at the time of the offense and damaged his own brain through the chronic abuse of methamphetamine. (27 RR 132, 168-69, 186-87). Of course, Sprouse argues that this information would have supported a settled-insanity defense, but as previously discussed, this defense was not available. Furthermore, if this constitutes "powerful mitigation evidence," as Sprouse contends, then the jury heard it through the testimony of Dr. Rogers and, to a lesser extent, through Dr. Crowder.

Dr. Anderson's report does not undermine the Court's confidence in the jury's guilty verdict or its punishment verdict, and it fails to demonstrate *Strickland* prejudice. *See Livingston*, 107 F.3d at 308. The claims in Issue 1b and 3c regarding counsel's failure to retain a neuropsychologist lack merit.

19

### 3.  Failure to Investigate Birth Parents and Childhood Acquaintances

Sprouse's unexhausted claim regarding counsel's failure to investigate his birth parents and childhood acquaintances in preparation for the guilt phase (Issue 1c) likewise has no merit.  Sprouse concedes he is unable to present any evidence to show he was harmed by the alleged failure to investigate.  *Reply* at 2 n.1.  Accordingly, he cannot demonstrate *Strickland* prejudice.

To summarize, the following claims are unexhausted, procedurally barred, and lack merit: the guilt-phase claims in Issue 1b and 1c related to counsel's failure to hire a neuropsychologist and failure to investigate Sprouse's birth parents and childhood acquaintances; the jury-charge claim in Issue 2; and the punishment-phase claim in Issue 3c related counsel's failure to hire a neuropsychologist.  Because the claims lack merit, the *Martinez* exception to procedural bar would not apply.[6]  *See Martinez*, 132 S. Ct. at 1318.

## IV.  **EXHAUSTED CLAIMS**

### A.  **Applicable Law**

For claims adjudicated on the merits in state court, section 2254(d) states that a writ of habeas corpus shall not be granted unless the state court arrived at a conclusion that (1) was contrary to federal law clearly established in the holdings of the United States Supreme Court, (2) involved an unreasonable application of such precedent, or (3) was based on an unreasonable determination of

---

[6]Because Sprouse's claims lack merit, the Court need not address whether state habeas counsel was ineffective but notes that such a claim would be difficult to prove.  Habeas counsel pursued this writ in state court for four years, during which time she obtained two remands from the CCA for further factual development and received $19,000 to fund expert assistance, which was more funding than trial counsel received.  In addition to the addiction expert and mitigation specialist, state habeas counsel hired Dr. Goodness to provide an affidavit explaining how she would have advised trial counsel if she had been paid to act as a consulting expert during trial testimony.  (1 SHR 141-45; Supp. 2 SHR 35).  Federal counsel supplemented state habeas counsel's efforts with additional investigation into Sprouse's birth family, the results of which revealed nothing new, and a neuropsychological evaluation that confirmed the prior opinion of habeas counsel's addiction expert, Dr. Rustin.

the facts in light of the record before the state court.  *See* 28 U.S.C. § 2254(d)(1)-(2); *Richter*, 131 S. Ct. at 785.  Section 2254(d) does not authorize habeas relief, but bars relitigation in this Court of any claim adjudicated on the merits in state court, unless the exception in (d)(1) or (d)(2) applies. *See Richter*, 131 S. Ct. at 784.  The phrase "adjudicated on the merits" is a term of art referring to a state court's disposition of a claim on substantive rather than procedural grounds.  *See Green v. Johnson*, 116 F.3d 1115, 1121 (5th Cir. 1997).  Evidence introduced in federal court has no bearing on the determination made pursuant to § 2254(d).  *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1400 (2011) (holding that a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before the state court); 28 U.S.C. § 2254(d)(2) (providing that the reasonableness of the state court's determination of the facts is assessed "in light of the evidence presented in the State court proceeding").  The standard in section 2254(d) is difficult to meet, highly deferential, and demands that state-court rulings be given the benefit of the doubt.  *See Pinholster*, 131 S. Ct. at 1398 (internal citations omitted) (quoting *Richter*, 131 S. Ct. at 786, and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*)).  "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  *Richter*, 131 S. Ct. at 786.

Finally, section 2254(e)(1) presumes that the determination of a factual issue made by a state court is correct.  *See* 28 U.S.C. § 2254(e)(1).  Under this provision, the applicant has the burden of rebutting the presumption of correctness by clear and convincing evidence.  *Id.*

## B.  Discussion

### 1.  Failure to Retain Addiction Specialist

In Issues 1a and 3d, Sprouse complains of trial counsel's failure to retain an addiction specialist at both phases of trial.  *Petition* at 30, 44.  These claims are exhausted.  Sprouse's tenth

ground for relief in state court was an unambiguous *Wiggins/Rompilla* claim that challenged counsel's mitigation investigation at punishment. (1 SHR 70-73). Nevertheless, after receiving funds to retain an addiction specialist, Dr. Rustin, Sprouse filed a supplemental writ application that included within ground ten these guilt- and punishment-phase claims. (Supp. 6A SHR 64-72). The state habeas court addressed the claims concerning Dr. Rustin without reference to any specific phase of trial. (Supp. 6B SHR 303-04). The state court also found that trial counsel chose to present mitigation evidence, in the context of an insanity defense, during the guilt phase of trial. (Supp. 6B SHR 304). It is apparent that the line between the guilt phase and the punishment phase–particularly as to Sprouse's mental state evidence–was not rigidly drawn in this case. Given these circumstances, the Court concludes that the briefing in Sprouse's tenth ground for relief provided the state court with a fair opportunity to apply the controlling legal principles to the facts bearing upon both the guilt- and punishment-phase aspects of this claim. *See Hill v. Lockhart*, 28 F.3d 832, 835 (8th Cir. 1994) (reasoning that ineffective-assistance-of-counsel claim, which focused primarily on mental health evidence overlooked by counsel in the penalty phase, was sufficient to apprise state court of guilt-phase claim). This Court therefore reviews the state court's decision on the merits under section 2254(d).

The state court found that Dr. Goodness had expertise in addiction and substance abuse and provided counsel with a tremendous amount of information about methamphetamine-induced psychosis and alteration of the human mind due to methamphetamine use. (Supp. 6B SHR 302 (nos. 1, 2, 3)). The state court concluded that the habeas addiction expert, Dr. Rustin, did not provide any additional information that would demonstrate *Strickland* prejudice. (Supp. 6B SHR 303 (nos. 10,

22

4)).[7]  Sprouse asserts, however, that Dr. Rustin would have provided testimony that (1) Sprouse was brain-damaged from chronic methamphetamine abuse and (2) contradicted Dr. Rogers's testimony that Sprouse was intoxicated at the time of the offense.  Together, this could have persuaded the jury that Sprouse was suffering from "settled insanity" rather than intoxication and, if the jurors believed he was not intoxicated at the time of the offense, there is a reasonable probability they would have spared his life.  *Petition* at 33, 44.

This Court has already concluded that settled insanity was not an available defense and that counsel's investigation into Sprouse's mental state was professionally reasonable.  Dr. Rustin's report does not alter this Court's conclusions nor does it demonstrate that the state court's conclusions were unreasonable.

As discussed, Dr. Goodness conducted three distinct psychological evaluations on Sprouse and a full mitigation investigation.  *See supra* at 16.  She also advised trial counsel on drug-related topics, such as methamphetamine-induced psychosis; the effects of methamphetamine use, including aggressive tendencies, risk factors for violence, and the link between methamphetamine abuse and crime; the difficulties in treating methamphetamine addiction; the history of methamphetamine use in the United States, resources for current local trends, and a "DEA overview" of the greater Dallas/Fort Worth area.  (2 SHR 176-233).  She diagnosed Sprouse with schizophrenia and amphetamine dependence in institutional remission, and left open the possibility that Sprouse's symptoms were caused in whole or in part by substance abuse.  (2 SHR 297-98, 315).  She advised that chronic methamphetamine use is "a brain damaged state in that chronic use permanently alters

---

[7]The CCA did not adopt the state habeas court's finding that Dr. Rustin's opinion was not credible, and the Court gives this finding no deference.  (Supp. 6B SHR 303 (no. 8)); *Sprouse*, 2010 WL 374959 at *2.

and damages the brain." (2 SHR 298). Similarly, Dr. Crowder testified that Sprouse's psychosis was caused either by schizophrenia or by permanent brain damage from drug abuse, and that drug abuse "certainly worsened" his mental state. (26 RR 137-40). The State's expert, Dr. Rogers, testified more decisively that Sprouse's disorder was substance-induced. (27 RR 132, 168-69).

Dr. Rustin's report is based, in part, on information that trial counsel already possessed, namely, Dr. Goodness's report and the Dr. Matthews videotape. *Attachment D* at 10. To this extent, the factual basis for Dr. Rustin's report was already known to the defense. Dr. Rustin's report also contains information similar to that provided by Dr. Goodness and Dr. Crowder about how chronic amphetamine use causes permanent changes to the brain, delusional thinking, paranoid fears, and hostile acts in response to perceived threats. *Attachment D* at 8-9. Dr. Rustin concluded that Sprouse was addicted to marijuana and methamphetamine and that a decade of chronic meth-amphetamine use damaged Sprouse's brain and caused his unprovoked, violent behavior at the time of the offense. *Attachment D* at 10. Dr. Rustin concluded that Sprouse has delusions (bizarre beliefs) and is introverted. He also found that Sprouse has "intact" mental functioning in six areas, an "appropriate" fund of knowledge, "superior" functioning in math, "appropriate" grooming and behavior, no hallucinations, logical and goal-directed thought process, and "somewhat circumstantial" but otherwise intact speech. *Attachment D* at 6-7. Thus, Dr. Rustin's report contains information that is substantially similar to that provided by Dr. Goodness and Dr. Crowder, and Dr. Rustin's diagnosis actually favors the State's theory at trial. *See Attachment D* (Rustin's formal report of July 6, 2009); (Supp. 6B SHR 275 (Rustin's preliminary findings of May 19, 2009)).

Sprouse also contends that Dr. Rustin could have refuted the evidence that he was intoxicated at the time of the offense and that this would have persuaded the jury to accept the alternative

explanation of "settled insanity" or, perhaps, spare his life. *Petition* at 30-33, 44-45; *Reply* at 6, 11-12. The Court disagrees with Sprouse's characterization of the impact that Dr. Rustin's sobriety testimony would have had on the trial.

First, a paramedic testified during cross-examination by defense counsel that Sprouse did *not* appear to be intoxicated when he treated him at the scene for his injuries. (24 RR 196). This paramedic was not an addiction expert like Dr. Rustin but was trained specifically to recognize signs of intoxication due to the ingestion of alcohol or controlled substances, and he was an eyewitness to Sprouse's state of sobriety minutes after the offense. (24 RR 196). Dr. Rustin's opinion would have been duplicative of this testimony, if not overshadowed by it.

Second, Dr. Rustin confirms that Sprouse smoked amphetamine and marijuana on the morning of the offense and that it showed up in his urine screen at the hospital. *Attachment D* at 8, 10. Dr. Rustin's conclusion that Sprouse was, nevertheless, not intoxicated was based on Dr. Rustin's reading of the trial testimony of the gas station proprietor, i.e., information that was already before the jury. (24 RR 59); *Attachment D* at 8. In contrast, a surgeon at Parkland Hospital testified for the prosecution that Sprouse was under the influence of drugs based on his personal observation of Sprouse as well as Sprouse's subsequent verbal admissions and a positive drug screen. (27 RR 8-13). Dr. Clayton, in addition to Dr. Rogers, testified based on post-offense evaluations that Sprouse was intoxicated at the time of the murders. (27 RR 71, 132). Given the state of the evidence, the Court disagrees that Dr. Rustin's opinion as to Sprouse's sobriety, based on lay testimony that was already before the jury, would have "completely changed the dynamics of the trial." *Petition* at 33.

25

Third, Dr. Rustin's report contains information that would have been harmful to Sprouse's case. Specifically, it confirms that Sprouse used drugs on the day of the offense and that he does not believe his drug abuse is a problem. *Attachment D* at 7, 10. It also indicates that Sprouse "does not show any remorse for the deaths of the two men he shot" and that Sprouse explained the second-in-time shooting of Officer Steinfeldt as "in for a penny, in for a pound," saying that "it didn't matter" because he was already in trouble. *Attachment D* at 6-7.

Sprouse has not asserted that the state court's conclusions on this matter conflict with any clearly established federal law. Rather, he has reasserted these claims in the context of the "settled-insanity defense," which this Court has determined was not available to him. Having compared the opinion of Dr. Rustin to the opinions of Drs. Goodness and Crowder as well as the testimony of Dr. Rogers, the Court concludes that Dr. Rustin's report does not undermine this Court's confidence in the guilty verdict or the punishment verdict. The state court reasonably rejected this claim for failure to demonstrate prejudice under *Strickland*. The Court denies the claims in Issue 1a and 3d regarding counsel's failure to hire an addiction specialist at both phases of trial.

### 2. Failure to Investigate Birth Parents and Childhood Acquaintances

In Issue 3b, Sprouse challenges the sufficiency of trial counsel's punishment-phase investigation into his birth family and childhood acquaintances. This claim was raised and funded in state habeas proceedings. Toni Knox prepared a full mitigation report for state habeas counsel, including a critique of the trial investigation and a witness list. (Supp. 6B SHR 86-276). Knox contacted Sprouse's birth parents through Missouri social services and spoke to his birth mother by telephone. The mother indicated that she had a cousin with bipolar disorder and a drug problem and reported no mental health issues in any of her other children. (Supp. 6B SHR 123). The biological

father apparently provided no information additional to what was already in the adoption papers. (Supp. 6B SHR 124-25).

The state court concluded that Sprouse was not prejudiced by counsel's alleged failure to investigate Sprouse's birth family and childhood acquaintances.  The court found:  the statements of the birth mother regarding her cousin did not undermine confidence in the trial proceeding; Knox's habeas mitigation report was largely repetitive of Dr. Goodness's trial mitigation report; the mitigation witnesses possessed negative information as well as positive information; some of the positive information had been presented to the jury; and the presentation of any testimony during the punishment phase would have allowed the State to present damaging rebuttal testimony from Officer Steinfeldt's father, who had lost his only child, and the officer's pregnant widow, who had lost her home due to her husband's murder.  (Supp. 6B SHR 303-04).  The state court concluded that counsel's decision to put on mitigating evidence in the context of an insanity defense and not present additional evidence during punishment, which avoided victim-impact testimony on rebuttal, was a reasonable trial strategy. (Supp. 6B SHR 304).[8]

Sprouse makes no argument that the state-court decision is contrary to federal law or unreasonable.  *Petition* at 43; *Reply* at 10.  Sprouse has, therefore, not met his burden to show he is entitled to relief on this claim.  *See* 28 U.S.C. § 2254(d).  In any event, the state court conclusions are supported by the record and not an unreasonable application of *Strickland*.  *Compare* (2 SHR 176 (Dr. Goodness's trial mitigation notebook)) *with* (Supp. 6B SHR 86 (Knox's mitigation report));

---

[8]The CCA rejected the state habeas court's findings that trial counsel used an adoption specialist prior to November 8, 2002 in an attempt to locate Sprouse's parents (no. 6) and that the information provided by Sprouse's purported birth mother was not reliable and would have been inadmissible (no. 14). (Supp. 6B SHR 302-03). The CCA also rejected the state court's conclusion that trial counsel were not ineffective for failing to investigate Sprouse's birth parents because the investigation revealed that the parents could not be located (no. 2).  (Supp. 6B SHR 304). Accordingly, the Court gives no deference to findings 6 and 14 and conclusion 2.

(Supp. 1 SHR 56 (affidavit of trial counsel)); (Supp. 6B SHR 296 (affidavit of trial prosecutor)); *Bell v. Cone*, 535 U.S. 685, 699-700 (2002) (rejecting *Strickland* claim based on counsel's failure to present mitigating evidence and argument at sentencing phase where, among other things, extensive mitigating testimony was presented at guilt phase through insanity defense).[9]

### 3.  Counsel's Objection to Dr. Matthews's Videotape

The remaining punishment-phase ineffective-assistance claim in Issue 3a focuses on the videotape of Dr. Matthews's interview with Sprouse, which the prosecution offered into evidence and then withdrew after trial counsel objected.  According to Sprouse, trial counsel should not have objected because the tape was powerful evidence of Sprouse's psychological condition.  *Petition* at 40; *Reply* at 8-9.  Respondent contends that counsel lodged a valid objection to the videotape and that there is no prejudice because the jury received testimony that was similar to the evidence contained on the videotape. *Answer* at 29-33.

This issue was not raised as a separate ground for relief in state court.  It was, however, discussed in Sprouse's supplemental habeas petition and supported by the opinions of mitigation specialist Toni Knox and addiction specialist Dr. Rustin that the recording would have been valuable evidence for the defense.  (Supp. 6A SHR 66-68 (Ground 10)).  The state habeas court implicitly rejected the claim when it concluded that trial counsel was not ineffective for failing to request additional funding for addiction and mitigation experts, that no new evidence resulted from the additional habeas funding, and that Sprouse did not show a reasonable probability that the trial

---

[9]Knox's report states that both she and Dr. Goodness operated under time and funding constraints.  (Supp. 6B SHR 95, 98).  Sprouse consequently received additional funds from the Court to further develop this issue, but he concedes that he is unable to present any evidence to show he was harmed by the allegedly inadequate investigation. *Reply* at 10.

outcome would have been different with the additional funding.  (Supp. 6B SHR 307 (nos. 1, 3, 4)).

The Court therefore reviews this claim under section 2254(d).  *See Richter*, 131 S. Ct. at 784-85

(holding that § 2254(d) applies even to summary denials unaccompanied by an explanation).

Dr. Matthews testified for the State at the competency trial, and his five-hour interview with

Sprouse was recorded on videotape.  (9 RR 63).  The prosecution provided a copy of the Matthews

videotape to defense counsel approximately six months before the capital murder trial began.  (6 RR

28).  The prosecution sought to admit the videotape during the punishment phase because it

contained Sprouse's description of the offense and prior criminal acts and drug use, which the

prosecutor argued were relevant to the future dangerousness and mitigation special issues.  (29 RR

66).  Trial counsel, who had believed the State was going to introduce the tape at the guilt phase,

lodged five objections to the tape during a lengthy admissibility hearing, including an objection that

the tape does not contain the necessary Fifth Amendment warnings.  (29 RR 55-56, 64-68, 70-71).

The judge recessed to watch the first two hours of the videotape, and then advised the parties of his

inclination to exclude the tape based on inadequate Fifth Amendment warnings.  (29 RR 72-76).

The prosecutor then conceded that Sprouse had not been properly warned, withdrew the proffer, and

notified the court of its intention to rest when the trial resumed the next day.  (29 RR 76-78).  Upon

questioning by the court, defense counsel advised that he did not intend to introduce the videotape.

(29 RR 77).  The following morning, the judge reaffirmed the prosecutor's decision not to offer the

videotape, and both sides rested and closed.   (30 RR 4).

Sprouse does not dispute that a valid objection to the videotape was available under *Estelle*

*v. Smith*, 451 U.S. 454, 468 (1981) (holding that testimony by state's psychiatrist as to future

dangerousness, which was based on competency evaluation conducted without notice to counsel or

*Miranda* warnings, violated right against self-incrimination and right to counsel). *Reply* at 8. Rather, he contends counsel's objection fell below objective professional standards because it was a "knee jerk" reaction that wasted a "golden opportunity" to have the jury receive what would otherwise have been inadmissible hearsay evidence of his own statements, admitted without the risk of cross-examination. *Petition* at 40; *Reply* at 8-9. He points out that there is no evidence in the record that counsel made a conscious, strategic decision to object. *Reply* at 9.

Under *Strickland*, however, counsel is strongly presumed to have rendered adequate assistance, and it is Sprouse's burden to overcome that presumption by showing that counsel failed to act reasonably considering all the circumstances. *See Pinholster*, 131 S. Ct. at 1403. Further, a conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness. *See Pape*, 645 F.3d at 291.

Here, the record affirmatively demonstrates that counsel's decision was both conscious and informed. The objection was readily justified under *Estelle* because the warnings at the beginning of the recording are incomplete. *See* doc. 53. The length of the admissibility hearing, the number of counsel's objections, and the fact that counsel possessed the tape and was prepared for the State to introduce it at guilt, all belie Sprouse's contention that counsel's objection was an uninformed, knee-jerk reaction. Counsel also had the opportunity to reconsider the matter overnight, before both sides rested and closed.

Moreover, counsel's decision to object was not "so ill chosen that it permeated the entire trial with obvious unfairness." Sprouse asserts that the recording shows him "talking, gesturing, and emoting in ways that demonstrate his psychotic state." *Reply* at 9. The Court disagrees with this

30

characterization.  It is true that Sprouse articulates bizarre or paranoid ideas and describes *past* experiences that were hallucinatory or delusional.  But while expressing these beliefs and past events, Sprouse appears composed, articulate, and intelligent.  As Sprouse's own expert, Dr. Rustin, observed, "The interview . . . shows Mr. Sprouse to have many firmly held ideas of reference (paranoid ideas relating to himself), but intact intelligence, executive function, and abstracting ability," as well as intact "abstraction, memory, concentration and speech."  *Attachment D* at 7, 8.

In fact, on the videotape, Sprouse expresses doubt in his bizarre belief that he is the Lord in human form on Earth by acknowledging that he should be able to get himself out of his current problem if he is God and that if he is just "Joe Schmoe, regular old country boy," then "the joke" is on him.  When asked if he would go along with an insanity defense, he said he would be a fool not to, that maybe he could be convinced he is not God but has some mental illness.  Sprouse concludes: "[I]f I did get away with this without due process, then hell, everybody be out there blowing people away, running around screaming they're God.  We just can't have that."  Sprouse's admission of the possibility that he is not God undermines the genuineness of the delusion.  Defense counsel knew the significance of this because Dr. Matthews testified about it in the competency trial.  (9 RR 82).

Furthermore, Sprouse's strange beliefs would have had limited mitigating impact at punishment because they did not explain why he shot two people.  Sprouse described the murders as "stupid and ignorant."  He believed the customers were laughing at him because his car would not start, so he fired a warning shot towards two men near a telephone.  He denies intending to kill Mr. Moreno, saying that he fired at him to make him leave, and that the slug accidentally ricocheted off the gas pump.  Acknowledging he was in "deep shit," Sprouse describes how he watched Officer Steinfeldt arrive at the scene, check on the victim, and then look around for the shooter.  When the

officer finally saw Sprouse and reached for his weapon, Sprouse shot him, apparently intentionally. Sprouse's retelling of the offense would have confirmed the State's testimony that Sprouse was not psychotic or acting under any delusions or hallucinations at the time of the murders. (27 RR 77, 132, 134-36, 142-44, 158, 183).

The recording also contains information about Sprouse's extraneous offenses of drug possession, driving while intoxicated, flagrant reckless driving (including passing on the shoulder at 110 miles per hour), and carrying illegal weapons and loaded rifles. Sprouse admits that, two days before the murders, he purchased and had been using a "bag of weed" and some methamphetamine, which supports the State's intoxication theory. He also admits to smoking 4 to 5 and sometimes 10 to 12 "joints" per day for a "good ten years." He says he "kinda liked" methamphetamine and smoked it steadily from age 16 to 18 and from age 21 to present. He also used Valium, especially while drinking alcohol in quantities of up to twelve beers a day, and said it knocked a few strokes off of his golf game. He tried cocaine about ten times, but did not like it, and tried LSD about four times, which made him laugh uncontrollably. Once, he "snatched" his grandmother's Demerol from the trash can. As recognized by the defense team's own mitigation expert, Sprouse also appears to use the interview as a platform to argue for the legalization of drugs, which could have eroded any sympathy the jury might have had for his mental problems. (2 SHR 319).

Evidence of Sprouse's bizarre beliefs and past psychotic behavior was admitted through the testimony of Dr. Crowder, four lay witnesses (including Sprouse's mother), and photographs of his living quarters and surrounding area. (26 RR 9-123, 132-71; DX 1-29, 34-36, 40). As defense counsel argued at punishment, "[M]itigation. We could have paraded the family and friends up here. But you already know that. It's come out during the first phase of the trial. You already know." (30

32

RR 20). Thus, counsel provided much of the same anecdotal information to the jury through live witnesses without the added risk of the jury seeing Sprouse confirm and defend his drug abuse.

The state court's application of *Strickland* was not unreasonable. Counsel could have reasonably determined that any benefit obtained by the videotape would be outweighed by its aggravating effect. *See Brewer v. Quarterman*, 550 U.S. 286, 292-93 n.4 (2007) (holding that mitigating evidence of depression and substance abuse was a two-edged sword that tended to confirm the evidence of future dangerousness).

To summarize, the Court denies the following exhausted ineffective-assistance claims because the state court's resolution was not unreasonable: the guilt-phase claim in Issue 1a and the punishment-phase claim in Issue 3d regarding counsel's failure to retain an addiction expert; the punishment-phase claim in Issue 3b that counsel failed to investigate Sprouse's birth parents and childhood acquaintances; and the punishment-phase claim in Issue 3a regarding counsel's objection to the Matthews videotape.

### 4. Sufficiency of the Evidence

In Issue 4, Sprouse challenges the CCA's resolution of his claim on direct appeal that the evidence is legally insufficient to support the jury's answer to the future dangerousness special issue. The future dangerousness special issue asks the jury: "Is there a probability that the defendant, Kent William Sprouse, would commit criminal acts of violence that would constitute a continuing threat to society?" (CR 102). In determining the sufficiency of the evidence, a reviewing court may not substitute its view of the evidence for that of the fact finder, but must consider all of the evidence in the light most favorable to the prosecution and decide whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443

U.S. 307, 319 (1979). This Court may reach the merits of this claim only if the state court decision was contrary to or involved an unreasonable application of the already deferential *Jackson* standard. *See* § 2254(d).

Upon applying the *Jackson* standard, the CCA found the following evidence sufficient to support the jury's answer to the future dangerousness special issue: (1) without hesitation or emotion, Sprouse shot one person he decided was an undercover police officer and a second person he knew was a police officer, (2) he repeatedly professed to various individuals that he had shot two officers, (3) he ingested drugs prior to the offense, (4) he was mentally ill in a way that the jury could conclude would cause him to behave in a manner that constituted a threat to society, both in prison and out, (5) the same conclusions could be drawn concerning his drug use or any combination of his drug use and his mental illness, and (6) on a prior occasion unrelated to this offense, officers had been called to Sprouse's house when he was acting in a threatening manner towards his family. *Sprouse*, 2007 WL 283152 at *4.

Sprouse argues that the CCA's determination was unreasonable because there was no evidence he had a criminal history or prior violent acts and the crime was not committed with forethought. He argues that he has no incidents of misbehavior in jail and "absolutely no evidence" predicting that his psychiatric condition would result in future acts of violence. Sprouse also argues that, under the State's theory that he committed this offense while intoxicated, Sprouse would not be a future danger because drugs would not be available to him in prison. *Petition* at 45-47.

Sprouse understates the disturbance between him and his parents as a non-violent act. When the police arrived, Sprouse's parents were scared, and Sprouse told the police that he had just fired the gun into the ground. (29 RR 25, 29). Sprouse was in possession of a .357 handgun, which he

34

surrendered, and he had two long guns in his apartment.  (29 RR 26, 29-30).  In addition to this violent act, Dr. Crowder confirmed on cross-examination that some of Sprouse's friends reported that Sprouse had pulled a gun on them.  (26 RR 164).  Furthermore, during her cross-examination by the prosecutor, Sprouse's mother described an occasion when Sprouse threatened to kill her because he believed the family horse would die if kept in the corral.  She testified, "[H]e got right here against my nose almost and said that he would kill me before he let me kill the horse."  (26 RR 107).  She described another occasion where she was arguing with Sprouse about going to the doctor when his father intervened, and Sprouse "chest-bumped" him and knocked him into a table.  (26 RR 108).

Sprouse also downplays the evidence that indicates he was prepared to use deadly force on the day of the murders and shot Officer Steinfeldt with forethought.  For example, Sprouse told Dr. Clayton that he went to the convenience store after he had fought with his father and "kinda of fumed around."  (27 RR 56-57).  Sprouse took with him a sawed-off shotgun and two boxes of ammunition.  (25 RR 50-52).  There is eyewitness testimony that Sprouse shot the first victim without any apparent provocation and there is testimony from the experts that he knew this was wrong and tried to start his car because "he wanted to get out of there."   (24 RR 121-22; 27 RR 59, 144-45).  There is evidence from which the jury could conclude that Sprouse essentially ambushed Officer Steinfeldt from inside his car.  (24 RR 110-11, 123-24, 137-38, 149).  Sprouse would later tell Dr. Rogers that, with respect to shooting the officer, he had decided he was going to "finish it" at that point.  (27 RR

145).  One eyewitness testified that Sprouse tried to get his car working and then attempted to flee on foot.  (24 RR 126, 130-31).[10]

Evidence of no misbehavior in the jail while awaiting trial for capital murder and an absence of expert testimony predicting Sprouse would commit future acts of violence do not undermine the CCA's conclusions.  Sprouse has identified no clearly established federal law that requires the reviewing court to give this type of evidence, or a lack thereof, conclusive weight on the future dangerousness issue.  Moreover, the Court has found no evidence in the record that drugs are not available in prison.  In fact, the State would have called a witness to say that drugs *are* available to inmates in prison, but trial counsel successfully objected to that testimony.  (29 RR 41, 47, 52-54).  As the CCA noted, evidence of drug abuse and mental illness–which Sprouse's experts agree is likely permanent–can cut both ways.  *Id.* at *4 n.6; *see Brewer*, 550 U.S. at 292-93 n.4 (recognizing that Brewer's mitigating evidence of depression and substance abuse tended to confirm the State's evidence of future dangerousness, specifically, testimony of police officer who had been called to quell a family dispute).  The CCA's assessment of the evidence in this case was not unreasonable, and Issue 4 is denied.

### 5.  Counsel's Assistance During Competency Trial

In Issue 5, Sprouse challenges the state habeas court's rejection of his claim that trial counsel provided ineffective representation during the competency trial.  This ineffective assistance claim derives from a long-standing Texas rule that it is improper to introduce evidence of the offense itself during a hearing on competency to stand trial.  *See Barber v. State*, 757 S.W.2d 359, 361 (Tex. Crim.

---

[10]The jury also viewed a store security videotape and the officer's squad car videotape of the events, which apparently show Sprouse waiting for 28 seconds after the officer arrived before shooting him.  (24 RR 49, 63; 25 RR 90-91; 28 RR 16-17).

App. 1988) (citing *Goodman v. State*, 701 S.W.2d 850, 862 (Tex. Crim. App. 1985)).  Reversal is required under this rule when the evidence of the offense brought to the attention of the competency jury is of such nature as to deny the accused a "fair trial and impartial determination of his competency."  *Id.*

At the competency trial, the prosecutor read the indictment before the jury.  (9 RR 6-7).  Later, the State's expert, Dr. Matthews, narrated a slide show on the evaluation he conducted.  (9 RR 67-80).  Dr. Matthews testified, "When I asked him what the police said he did, he said, ['A]ccording to Sheriff Ledbetter, I killed a man with a ricochet off a gas pump and then what followed is a cop came and he shouted out and I killed him.  That's the reason I'm being held.[']"  (9 RR 71) (quotation marks added).  In his state habeas application, Sprouse complained that counsel should have objected to the reading of the indictment and to Dr. Matthews's testimony on the subject of whether Sprouse understood the charges against him.  (1 SHR 62).

The state court found that no evidence was presented regarding the underlying capital murder charge and that only incidental references were made.  (Supp. 1 SHR 126 (no. 56)).  That state court also found that it had instructed the jurors that the indictment "is no evidence of present competency to stand trial" and that they should not to consider or discuss Sprouse's guilt or innocence of the charged offense.  (Supp. 1 SHR 126 (no. 58); CR 56).  The state habeas court concluded that Sprouse was "not denied a fair and impartial determination of his competency."  (Supp. 1 SHR 126 (no. 62)).  The court also concluded that Sprouse's rights to due process and effective assistance of counsel were not violated.  (Supp. 1 SHR 126 (no. 61)).  These findings and conclusions were adopted by the CCA.  *Sprouse*, 2010 WL 374959.

The state court's conclusion that Sprouse was not "denied a fair and impartial determination of his competency," as required for reversal by *Barber*, is binding on this Court. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Schaetzle v. Cockrell*, 343 F.3d 440, 448-49 (5th Cir. 2003) (holding that it is not the function of federal habeas courts to review a state's interpretation of its own law) (quoting *Weeks v. Scott*, 55 F.3d 1059, 1063 (5th Cir. 1995)).   And, in any event, the state court's conclusions appear to be supported by the very case law upon which Sprouse relies.   *See Petition* at 49; *Goodman*, 701 S.W.2d at 862-63 (finding no reversible error where expert-witness related the accused's understanding of the charges against him and the indictment was contained in the court's charge, but jury was instructed not to consider the indictment or the accused's guilt or innocence in their competency determination).[11]   Because there was no reversible error under state law, counsel's failure to object does not constitute ineffective assistance.   *See Green v. Johnson*, 160 F.3d 1029, 1037 (5th Cir. 1998) (holding that failure to make frivolous objection does not cause counsel's performance to fall below an objective level of reasonableness).

Sprouse challenges the state court's ruling with a 2011 affidavit provided by trial counsel in which he states that it did not occur to him to object because he was "not aware at that time that a valid objection could be made to disclosure of the facts of the case during the competency trial." *Attachment K*.  This affidavit was not presented to the state habeas court, however, and cannot be used to assess the reasonableness of the state court's decision under § 2254(d).  *See Blue v. Thaler*, 665 F.3d 647, 655-56 (5th Cir. 2011), *cert. denied*, 133 S. Ct. 105 (2012).  Nevertheless, counsel's subjective state of mind does not affect the analysis under *Strickland* because *Strickland* calls for an

---

[11] *Goodman* was overruled on other grounds by *Hernandez v. State*, 757 S.W.2d 744, 752 (Tex. Crim. App. 1988), which was in turn overruled by *Fuller v. State*, 829 S.W.2d 191, 200 (Tex. Crim. App. 1992). *Crutsinger v. State*, 206 S.W.3d 607, 608 n.2 (Tex. Crim. App. 2006).

inquiry into the objective reasonableness of counsel's performance. *Richter*, 131 S. Ct. at 790. The 2011 affidavit does not render the state court's decision unreasonable under federal law, and Issue 5 is denied.

## V.  CLAIMS PRECLUDED BY CIRCUIT PRECEDENT

Sprouse concedes the remaining issues raised in his petition are foreclosed by Fifth Circuit precedent. *Reply* at 1.

### A.  Voluntary Intoxication Instruction in Punishment Charge

In Issue 6, Sprouse disputes the state court's resolution of his claims that trial and appellate counsel rendered ineffective assistance by failing to challenge an intoxication instruction in the punishment charge as a violation of the Eighth and Fourteenth Amendments.  (1 SHR 56-59). Sprouse's state habeas counsel argued that the voluntary intoxication instruction required by Texas penal code § 8.04 was an unconstitutional limitation on the jury's ability to consider mitigating evidence.  (1 SHR 49).

The first page of the court's punishment charge instructed the jury to consider "*all evidence submitted to you during the whole trial as to defendant's background or character or the circumstances of the offense that mitigates against the imposition of the death penalty.*"  (CR 101) (emphasis added). It later provides:

> You are instructed that the term "mitigating evidence," as used herein, means evidence that a juror might regard as reducing the defendant's moral blameworthiness.
>
> You are instructed that under our law neither intoxication nor temporary insanity of mind caused by intoxication shall constitute any defense to the commission of a

crime.[12]  Evidence of *temporary insanity caused by intoxication* may be considered in mitigation of the penalty, if any, attached to the offense.

By the term "intoxication" as used herein is meant disturbance of mental or physical capacity resulting from the introduction of any substance into the body.

By the term "insanity" as used herein is meant that as a result of intoxication the defendant did not know that his conduct was wrong.

Now, if you find from the evidence that the defendant, Kent William Sprouse, at the time of the commission of the offense for which he is on trial, was *laboring under temporary insanity as defined in this charge, produced by voluntary intoxication, then you may take such temporary insanity into consideration in mitigation* of the penalty which you attach to the crime.

The mitigation special issue then reads as follows:

## Special Issue No. 2

*Taking into consideration all of the evidence*, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, do you find that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

(CR 103) (emphasis added).

The state habeas court concluded that there was no error in the charge under *Drinkard v. Johnson*, 97 F.3d 751, 758-59 (5th Cir. 1996).[13]  Therefore, neither trial counsel nor appellate counsel performed deficiently in failing to challenge the instruction.  (Supp. 1 SHR 124-25 (no. 48)).

As Sprouse acknowledges, this issue was decided against his position in *Narvaiz v. Johnson*, 134 F.3d 688, 692-94 (5th Cir. 1998) (citing *Drinkard* and *Lauti v. Johnson*, 102 F.3d 166, 169-70 (5th Cir. 1996)).  *Petition* at 54-55.  The *Narvais* opinion reasoned that the general instruction to

---

[12]Trial counsel objected unsuccessfully to this portion of the charge as confusing to the jury since Sprouse had already been convicted.  (30 RR 6-7).

[13]*Drinkard* was overruled on other grounds by *Williams v. Taylor*, 529 U.S. 362, 410 (2000).  *See Neal v. Puckett*, 286 F.3d 230, 236 (5th Cir. 2002).

consider "all of the evidence" admitted at trial negates any inference that the intoxication instruction precludes consideration of non-insane, voluntary intoxication. *Narvais*, 134 F.3d at 693. The claim is therefore foreclosed by circuit precedent.

The Court notes, however, that the prosecutions in *Narvaiz*, *Drinkard*, and *Lauti* all predate the use of the mitigation special issue that is present in this case, as well as the Supreme Court's opinion in *Penry v. Johnson*, 532 U.S. 782 (2001). *Penry* appears to reject the type of reasoning relied upon in *Narvaiz* that a jury can logically and ethically follow two conflicting sets of instructions. *See Penry*, 532 U.S. at 799-800. Reasonable jurists would therefore find it debatable whether the instructions in this case are unconstitutional because they are internally inconsistent, i.e., that following one set of instructions (to consider "all the evidence") means ignoring the other (to consider intoxication evidence only if it arises to the level of temporary insanity). *Id.* Thus, the Court denies this issue but certifies it for purposes of appeal. *See infra* p. 43.

## B. Constitutionality of Texas Death Penalty Statute

Issues 7 through 11 challenge the state habeas court's rejection of Sprouse's claims that trial counsel rendered ineffective assistance by failing to challenge the constitutionality of the Texas death penalty statute. Conceding these claims are foreclosed by circuit precedent, Sprouse seeks only to preserve them for *en banc* Fifth Circuit review or review by the United States Supreme Court. These claims are based on counsel's failure to challenge the Texas statute on the ground that (1) it does not provide for meaningful appellate review of the special punishment issues, *Petition* at 55 (*contra Moore v. Johnson*, 225 F.3d 495, 505-07 (5th Cir. 2000) and *Martinez v. Johnson*, 255 F.3d 229, 241-45 (5th Cir. 2001)); (2) its definition of mitigating evidence is unconstitutionally narrow, *Petition* at 56 (*contra Beazley v. Johnson*, 242 F.3d 248, 259-60 (5th Cir. 2001)); (3) the future

41

dangerousness special issue does not define the terms "probability," "continuing threat to society," and "criminal acts of violence," *Petition* at 57 (*contra Turner v. Quarterman*, 481 F.3d 292, 299-300 (5th Cir. 2007)); (4) it prohibits the jury from being informed of the effects of a jury deadlock based on a single holdout juror, *Petition* at 58 (*contra Alexander v. Johnson*, 211 F.3d 895, 897 n.5 (5th Cir. 2000)); and (5) it violates *Apprendi v. New Jersey*, 530 U.S. 466 (2000) because it does not assign the burden to prove the non-existence of mitigating evidence to the State, *Petition* at 61 (*contra Scheanette v. Quarterman*, 482 F.3d 815, 828 (5th Cir. 2007)).  These claims are denied.

## VI.  <u>EVIDENTIARY HEARING</u>

Sprouse requests that an evidentiary hearing be held to resolve all factual disputes raised by the petition.  *Petition* at 63.  In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable a petitioner to prove the petition's factual allegations, which, if true, would entitle him to relief under 28 U.S.C. § 2254(d); *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).  In making this determination, "the judge must review the answer, any transcripts and records of state-court proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted."  *See* R. 8(a) of the Rules Governing  § 2254 Cases in the United States District Court.  The decision to grant a hearing rests in the discretion of the district court, unless a hearing is barred under 28 U.S. C. § 2254(e)(2).  *See Landrigan*, 550 U.S. at 468. To the extent Sprouse failed to develop the unexhausted claims in this petition, a hearing on those claims is barred under § 2254(e)(2).  Furthermore, because the pleadings demonstrate that there is no factual dispute upon which federal habeas corpus relief can be granted, no evidentiary hearing is warranted.

42

## VII.  CERTIFICATE OF APPEALABILITY

Under Federal Rule of Appellate Procedure 22(b), Sprouse cannot take an appeal from this order unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253(c).  Rule 11(a) of the Rules Governing Section 2254 Cases requires the Court to issue or deny a COA when it enters a final order adverse to the applicant.

A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  *See* § 2253(c)(2); *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  An applicant satisfies this standard by demonstrating that jurists of reason could disagree with the resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.  *See id.* (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)) . Where the district court dismisses the petition on procedural grounds, a petitioner satisfies this standard by showing that reasonable jurists would find it "debatable whether the petition states a valid claim of the denial of a constitutional right" and "debatable whether the district court was correct in its procedural ruling."  *Slack*, 529 U.S. at 484.

Only Issue 6 meets this standard.  It asserts that trial and appellate counsel were ineffective for failing to challenge the intoxication instruction in the punishment charge as an unconstitutional limitation on the jury's ability to give mitigating effect to evidence of non-insane intoxication.  For the reasons previously noted, reasonable jurists would find it debatable whether state habeas court's ruling conforms with clearly established federal law.

The Court **GRANTS** a certificate of appealability as to Issue 6.  In the event Sprouse files a notice of appeal, the Court notes that he may proceed *in forma pauperis* on appeal.  *See* 18 U.S.C. § 3006A(d)(7).

43

The Court **GRANTS** Respondent's motion for summary judgment and **DENIES** the application for habeas relief.

SIGNED this 29th day of  March,  2013.


_____
JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE